LAW OFFICES OF

## *Aidala, Bertuna & Kamins, P.C.*

ARTHUR L. AIDALA
MARIANNE E. BERTUNA
HON. BARRY KAMINS (RET.)
HON. JOHN LEVENTHAL (RET.)
JOHN S. ESPOSITO
MICHAEL T. JACCARINO
IMRAN H. ANSARI
DIANA FABI SAMSON
ANDREA M. ARRIGO
MICHAEL DiBENEDETTO
TAYLOR FRIEDMAN

546 FIFTH AVENUE
NEW YORK, NY 10036
TELEPHONE: (212) 486-0011
FACSIMILE: (212) 750-8297
WWW.AIDALALAW.COM

8118 - 13TH AVENUE
BROOKLYN, NEW YORK 11228
TEL. (718) 238-9898
FAX: (718) 921-3292

OF COUNSEL
JOSEPH A. BARATTA
ANTOINETTE LANTERI
WILLIAM R. SANTO
PETER S. THOMAS
LAWRENCE SPASOJEVICH

SENIOR COUNSEL
LOUIS R. AIDALA
JOSEPH P. BARATTA

July 11, 2022

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

**RE:    United States v. Anastasios Verteouris**
**20 Cr. 79 (RMB)**

Judge Berman:

On March 22, 2022, my client, Anastasios Verteouris, pled guilty to count one of a superseding information charging him with conspiracy to distribute a controlled substance. Mr. Verteouris is scheduled to be sentenced on August 2, 2022, before Your Honor. Please consider the attached memorandum in imposing an appropriate sentence for Mr. Verteouris.

Thank you for your time and consideration in this matter.

Respectfully,

Arthur L. Aidala
Aidala, Bertuna & Kamins, P.C.
Attorney for Anastasios Verteouris

cc:    AUSA Samuel Rothschild, Esq.
Robert Flemen, USPO

## I.      Introduction

This Pre-Sentence Memorandum is submitted by Arthur L. Aidala on behalf of his client, Anastasios Verteouris.  Mr. Verteouris pleaded guilty to one count of Conspiracy to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 846 and 841, under Crim. No. 20-79.  The purpose of this report is to provide the Court with information that is relevant to determining a just sentence.

Anastasios Verteouris accepts full responsibility for his conduct.   Nothing in this memorandum should be construed as an attempt to diminish or divert from his offense or the need for commensurate punishment, consistent with the full range of sentencing factors and objectives delineated in 18 USC § 3553(a).  It is our contention that the case facts and the nature of his offense conduct, Mr. Verteouris's record, and the clear lack of need or constructive use for incarceration, consistently and strongly favor a sentence of probation.  To that end, we respectfully, unequivocally, and in the strongest possible terms, recommend a non-custodial sentence, with conditions to be determined by the Court.

We make this request with full knowledge of the potential sentence that Mr. Verteouris is facing, as well as the need to curb opiate use in this country.  However, several factors warrant the above request, and we urge the Court to consider the following: Mr. Verteouris's positive history and current circumstances; that his drug related activity was extremely remote and was solely a product of his own addiction; his long history of being a hard-working and productive member of the community; his history of charitable works; current job circumstances; and, his role as a father to three young children who adore him. The following portrayal of Mr. Verteouris's positive history and current circumstances, taken together with the facts of the case, meaningfully distinguish him from others convicted of similar offenses, and heavily favors a non-custodial disposition.

In our view, an incarceratory sentence would run afoul of the overarching principle that a sentence should be "sufficient, but not greater than necessary" to serve the statutory goals of sentencing.

## II.     Social History

## A.      Family History and Current Composition

Anastasios Verteouris was born on December 28, 1977, in Astoria, Queens, to Dennis and Effie Verteouris (hereafter, "Mrs. Verteouris" and "the elder Mr. Verteouris"), and is the eldest of their two children.  His only full sibling was his brother Dmitri, who was also Anastasios's best friend and business partner, and who died last year at the age of 37.  Anastasios has two half siblings from his mother's second marriage: Emmanuel, age 33, who resides in Queens and is a regional manager for Staples; and, Maria, age 30, who is recently unemployed and who also lives in Queens. Anastasios also has one sibling from his father's second marriage: Marienthie, age 25, who recently graduated college and is a Registered Nurse at New York University Hospital.

Anastasios was initially reared in Brooklyn, New York, on 78th Street in Bay Ridge.  His parents, who were teenagers when his mother became pregnant, had migrated to Brooklyn from Greece.  When Anastasios was 9 years old, his parents separated.  Anastasios and Dmitri moved with their mother to Bayside, Queens, and their father remained in Bay Ridge.  Anastasios's mother was remarried to Christ Kosmas, who was an automotive engineer who owned a gas station/vehicle repair shop in Brooklyn.  Anastasios got along with his stepfather extremely well, and he now states that "he is blessed to have two fathers."  Anastasios reports a very normal, middle-income class childhood, and says that while they did not have the best of everything, he had what he needed. During these years, Anastasios and Dmitri would spend the weekdays in Bayside with their mother and the weekends in Bay Ridge with their father.  Anastasios did everything with his younger brother, with whom he was extremely close. This was especially true later, after their parents separated.  The two of them were very similar, shared bunk beds, and as the older brother, Anastasios always tried to look out for Dimitri.   When Dmitri was four years old, he needed open-heart surgery, as he was born with valvular stenosis of the aorta.  His first surgery was a valve replacement surgery.  He would eventually require a second, related surgery eight years later. Dmitri's condition brought the entire family together, as both of Anastasios's parents became close again, and Anastasios's father and stepfather even became very friendly with each other.  In addition, the entire extended family from both sides were always around to help.  Despite the circumstances, Anastasios has very fond memories from this time, as he loved being surrounded by family.

Anastasios's best memories from his childhood are easily those formed when he would visit his father's family in Greece every summer.  For nearly 20 years, until Anastasios's grandfather died, he would travel to his grandfather's farm on the island of Kefalonia, where his father was born. Taking these trips with his family instilled in him a deep appreciation for his ancestry, family roots,

heritage, and the love his entire extended family had for one another.

The second most impacting experience from his childhood were the weekends that Anastasios and his brother would spend with their father in Brooklyn. Anastasios refers to his father as his "hero." According to Anastasios, following his father's separation from his mother, his father went through significant financial hardship. However, he still managed to pay child support, send his children to Greece, and pay for their Greek schooling. Meanwhile, he couldn't so much as buy himself a pair of shoes. Everything the elder Mr. Verteouris made either went to his children or back into his business. The elder Mr. Verteouris was a self-employed restauranter, entrepreneur, and baker. In the late 1970s, he worked at the Tiffany Diner in Bay Ridge, Brooklyn. He learned the business and opened the Fort Hamilton Coffee Shop on 95th Street and 4th Avenue, where both he and Anastasios's mother worked together. Over the years, he would open and close many different restaurants and diners. After a diner in the Bronx went bankrupt, the elder Mr. Verteouris became a baker, selling wholesale cakes all over the Tri-State area to many different restaurants.

Growing up, Anastasios began working with his father at the age of 10. On the weekends, he and Dimitri would wake up with their father and go to the diner, as their father wanted them to appreciate the value of an earned dollar. Anastasios would work the cash register and watch his father run the business and interact with customers. These mornings would leave a lasting and positive imprint on Anastasios. From his father, Anastasios learned basic customer service skills. He would watch his father speak with the diner customers and he would try to mimic his father. He learned that, no matter what, it was always important to treat the members of the community well. From this time as a young boy, although his father did not want his sons to follow in his footsteps, it was Anastasios's dream to open and manage a restaurant. As Anastasios got older, he would go to his father's diner early on weekends and run the restaurant for a few hours so that his father could get a few extra hours rest. Today, Anastasios insists that everything that he learned about operating a restaurant, he learned as a child from his father. Later, Anastasios would work with his father three days per week as a baker, learning to make the bread, danishes and cakes, and delivering them in their work van.

Anastasios's Greek heritage was very important to him and his family. His maternal grandfather was a priest, and his family attended a Helenic church every week. For several years, Anastasios was an altar boy at St. Constantine and Helen in Jackson Heights. He attended St. Nicholas Greek Orthodox Middle School and Holy Cross High School, both in Flushing, Queens.

This was an all-boys school and Anastasios played soccer, track and field, and was on the wresting team. The discipline he began learning from his father was cemented while he was at Holy Cross. He graduated in 1994. Following graduation, Anastasios enrolled at St. Johns, where he studied from 1995-98, falling short of graduation by less than a year's worth of credits. While in college full-time, he worked as a waiter in Manhattan.

**B.      Restaurant Business and Nature's Grill Restaurant**

After three years at St. Johns, Anastasios had worked his way up to head server at a popular downtown Manhattan restaurant. He was making good money and wanted to continue to do it full-time. He loved the service industry and the constant interaction with dozens of people every shift. Because he knew his future was in the restaurant industry, he did not see the value in paying another year's tuition. Shortly thereafter, Anastasios and his best friend became inspired by a healthy restaurant concept that they observed in Queens. Anastasios had always been into sports, weightlifting, and living an active and healthy lifestyle. The concept he saw and wanted to model was a fresh juice bar. At the time, there was no concept like this in Brooklyn, and limited options in Manhattan and Queens. In October of 2001, they signed their first lease on 3rd Avenue in Bay Ridge, Brooklyn. At the time, the elder Mr. Verteouris had moved to Greece with his new wife. Although Anastasios was nervous to not have his father's expertise and support as a safety net, he wanted to follow in his father's footsteps. Despite this, he felt like they had nothing to lose, and he was thrilled to launch his own business. The concept was a juice bar and café that cooked all-natural, organic food and grass-fed meat. They were the first farm-to-table restaurant in Brooklyn, focusing on healthy, home-cooking with natural ingredients. The food was influenced by Mediterranean Greek cuisine that his parents cooked. Simply put, it was ahead of its time and was a pioneering restaurant in the, now pervasive, health food industry. It took off, due in large part to the long days and hard work that Anastasios dedicated to the business. From the beginning, he spent nearly every single day in the kitchen, working from 10:00 a.m. - 10:00 p.m. to chop vegetables and help prepare every single dish they served. He did this for nearly 2 ½ years. Finally, in 2003, they hired their first chef, who would go on to work with them for the next 12 years. The restaurant received a lot of press in magazine and newspaper articles, and the community interest and love of their food flourished.

In 2004, after hiring their first chef, Anastasios took steps to expand the business. Modeling

himself after his father, he moved to the front of the restaurant, where he would not only hire and train all of the employees, but he would greet and talk to each customer who came in.  Gradually, they hired more chefs, and Anastasios gave them the flexibility to create their own items for the menu.  Each step of the way, he would call his father in Greece for advice – to make sure he was doing things the right way.

Dimitri worked with Anastasios from the first day Nature's Grill opened.  In the beginning, although his brother just made juices and salads, Anastasios says that he was the backbone of the place.  Anastasios relied on him tremendously.  In 2006, when Anastasios's partner left to join a medical device business, it was only natural for the two brothers to become partners.  Anastasios recalls how proud his parents were, and how excited he was. It was a wonderful experience, and they were totally in synch from the beginning.  By this point in their lives, after doing everything together for decades, Anastasios says that they would finish each other's sentences.  At the restaurant, they each filled a different, yet complimentary, role.  Anastasios was the disciplined one, who got things done and who made sure things were done correctly.  He could be stern with the employees, but he was always fair.  He made sure the place ran correctly.   Dimitri was the charismatic, friendly one, who was so full of life.  Anastasios refers to him as "a modern-day John Candy," explaining that Dimitri had a gift to always be able to make people laugh and smile, even during tough times.  When they first became partners, they both ran the front counter.  Anastasios created a catering business, and would cold call hospitals and business, and give out free food to generate interest.  He would drive around Brooklyn handing out menus.  The non-stop hustling paid dividends, and the business grew exponentially.  Through neighborhood contacts, they became an unofficial sponsor of local boxer Paulie Malignaggi.  In exchange for feeding Malignaggi and his entire camp, the boxer wore a Nature's Grill logo on his shorts during his fights.

In 2010, they were approached to open a second location, which they eventually did.  It was located on Court Street in Downtown Brooklyn, and was financed by a group of investors, as well as Anastasios and Dimitri. Once it opened, Anastasios primarily ran the Court Street location while Dimitri operated the Bay Ridge location.  The concept was the same and the restaurant did very well from 2010-2016, although it was exhausting for Anastasios running back and forth between locations, as he not only had to grow the Court Street location from the ground up, but he also had to cover the nuts and bolts of the Bay Ridge location for Dimitri. For years, both businesses thrived.  In 2018, the brothers were able to open a 3rd location, located on Hylan Boulevard in Staten Island.

6

John Metzos, who has known Anastasios his entire life and who helped him open the second locations, states:

> "There are a few sayings on how Friendships and Business do not mix. I was aware of this in 2010. But I had such love and trust in [Anastasios] that I left my job and joined him in his endeavor. It was one of the happiest jobs I have ever had. We worked hard, very hard to build the new business to the success that it quickly became. We worked hard Your Honor but we also laughed and had an amazing time. My smile was on my face from the moment I opened the restaurant in the morning until the minute I left at night. During the first few years, our friendship became even stronger as I now had a new respect for him I would see how he handled his employees and customers. He was always respectful and compassionate especially to the people that worked for him He paid his kitchen staff top dollar and was always concerned if his wait staff made enough tips. He was not only an employer but he was also a friend." See, Attached letter from John Metzos.

Nature's Grill was constantly involved in charities throughout the community, usually spearheaded by Anastasios.  Every year, during Thanksgiving and Christmas, through the Greek Philanthropic Society and the Helleneic Charter School and Church, Nature's Grill donates hundreds of food boxes to be passed out to the homeless, and provides food donations for a dinner to support the struggling members of the parish.  For the past five years, Anastasios has participated in a monthly food drive through Hoy Cross Greek Orthodox Church on Ridge Boulevard in Staten Island, providing the sandwiches that get made and distributed. According to Helen Anagnostakos, a volunteer at Kimisis Theotokou Greek Orthodox Church, states:

> "I have worked with Anastasios Verteouris since 2017 through my Philoptochos Chapter to provide families in need of a holiday meal. Anastasios initiated our meeting by asking my Parish Priest, Father Damaskinos, how he can help children and families facing hunger and food insecurities within our community. Since 2017, it is Anastasios who calls me in late October inquiring what he can do for our food drive. As generous as he is, Anastasios refuses to be given any recognition for his generosity and commitment to helping children in need." See, Attached Letter from Kimisis Theotokou.

In October of 2012, during the aftermath of Hurricane Sandy, they set up tents for weeks and gave out food for people in Brooklyn affected by the storm. From 2011-2014, Anastasios and a group of people from the restaurant participated in the Tunnels to Towers run and donated food and proceeds raised from the run to the organization.  Nature's Grill was also heavily involved in the Knockout Obesity charity, which helps inner-city youth get access to boxing programs and healthy

foods. Beginning in 2014, through Dimitri, who struggled with weight his entire life, they would conduct outreach on Flatbush, Bushwick, and Harlem, and connect children with various schools, churches, and Gleason's Boxing Gym. Of course, Nature's Grill would provide the food. John Metzos states:

> "People have problems and unexpected things happen to us in life. Anyone on his staff could count on Taso for help and support. On many occasions I had seen him lend money to his employees or give them cash advances. Anastasios treated his customers no different. There were many times when Taso would call me as I was working at Nature's Grill and tell me to send food to the hospital because one of our customers was there. Taso would do food drives for the needy and destitute and was the biggest contributor in the neighborhood on Thanksgiving and Christmas to the local homeless shelters." <u>See</u>, Attached letter from John Metzos.

## C.   Pandemic and Business Struggles

It is no exaggeration to say that 2020 was the worst year of Anastasios's life. The COVID-19 pandemic destroyed Anastasios's business, and his brother died. It was a devastating year that also saw both of his parents spiral into depression following his brother's death.

The pandemic absolutely destroyed the entire restaurant business in New York City. Nature's Grill was not an exception, and Anastasios is still trying to dig himself out of the hole. When the pandemic struck, Nature's Grill lost more than half of its business. They were desperately trying to continue paying all the employees, which they were able to do throughout the pandemic. However, they suffered enormous economic loss and were having trouble making ends meet.

In September of 2020, both Anastasios and Dimitri fell ill with Covid. They were each sick for weeks. Dimitri, who had struggled with his weight his entire life, had been told by his doctor that he needed to keep his weight down. According to Anastasios, he thought he was invincible. He was larger than life, loved to eat, and had an addiction to food. Everyone was trying to get him to keep his weight down, including Anastasios. In 2014, Dimitri starred on a Food Network Show centered around overweight chefs. At the time, he lost 100 pounds. But in the Fall of 2020, he was back to weighing over 350 pounds, much of it added due to the stress of the pandemic. He was scared to leave his house, yet too embarrassed to go see his cardiologist. On December 12, 2020, Anastasios had dinner at his brother's home. Dimitri didn't look well, and Anastasios pulled him aside and had a long talk with him about his health. It would be the last time they spoke. The following day, Dimitri never woke up. Anastasios received a frantic call from Dimitri's wife, and he rushed to his

8

brother's home, arriving just in time to follow the ambulance to the hospital, where Dimitri would be pronounced dead, due to blood clots and heart failure. Dimitri's death devastated Anastasios and the entire family. According to Anastasios, Dimitri was the glue that held the family together, as he spoke to almost everyone every day and hosted dinner at his home every Sunday. Following his death, Anastasios's mother became deeply depressed, which continues to this day. In addition, the elder Mr. Verteouris has physically and mentally deteriorated, and the tremors he has developed in his hands appear to be the onset of Parkinson's disease. To Anastasios, it appears that his father has aged 10 years. For Anastasios, the loss of his brother, who was also his best friend and business partner, was crushing to him, and his loss continues to be incredibly painful. Anastasios, who feels that he is under an incredible amount of stress, started smoking cigarettes for the first time in his life, although he is now working hard to stop. He goes to his brother's grave site every single week.

The business was hit hard. The Staten Island location closed. The elder Mr. Verteouris, who had moved back from Greece, took over managing the Bay Ridge restaurant, while Anastasios could focus on keeping the Downtown Brooklyn location afloat. It didn't work. Anastasios was not able to keep both locations running, and he realized that without his brother, the Bay Ridge location needed him more than ever. So, instead of closing the Downtown Brooklyn location, he had an idea. Working at that location were three chefs who immigrated to Brooklyn from Latin America, and who had worked for Nature's Grill for nearly 18 years. Anastasios decided to give that location to them. He didn't ask for a dime. Although he helps them occasionally by giving advice, he plays no role in that location and has no ownership interest remaining, whatsoever. They have done extremely well. They renewed the lease, and they have been able to keep the business open. Anastasios is thrilled and is constantly rooting for them to succeed. According to Jonathan Cinto, who is now a part owner of the New Nature's Grill, states:

> "As a boss, [Anastasios] was always kind, patient and understanding. He always considered each member of his staff as extensions of his family, and he proved that to be true time and time again. He always offered to do volunteer catering events for nearby schools, as well as the local fire and police departments. I have witnessed him give free meals to homeless patrons that were either stationed outside, or would come in asking for help. He continuously worked from sun up to sun down, always showing his dedication to his staff and customers. A prime example of his generous and compassionate nature was an event that took place about a year and a half ago. After the loss of his brother, his grief became too great for him to be able to upkeep the three locations they built together all on his own. With COVID 19 adding insult to injury, our restaurant was struggling to stay afloat. Anastasios

wanted to do all he could to keep the store alive, and he was confident in myself and my peers to be able to breathe new life into it. He personally gifted me the key to the restaurant and trusted me with keeping his legacy alive. I am forever grateful for Anastasios and all he has done for me, and would not be where I am today if it wasn't for him." See, Attached letter from Jonathan Cinto.

Currently, Anastasios is working tirelessly to keep Nature's Grill afloat. He owes nearly $300,000 to the New York State Department of Taxation and Finance, mostly from taxes Nature's Grill could not afford to pay during the pandemic, and he is paying $5,000 per month, desperately trying to dig his business out of the hole into which the pandemic caused it to fall. See, Attached Installment Payment Agreements, Attached as Exhibit "A." He is paying vendors for bills he owed on the Downtown Brooklyn location before he transferred ownership, and he is barely taking home a paycheck. He also entered into a deferred payment program with the bank and also fell months behind on his home mortgage during the pandemic. But, he continues to maintain confidence in his ability to make things right again. According to Anastasios, "I cannot allow myself to fail." The Staten Island location has also re-opened, and he is hustling like he did when he first opened Nature's Grill. He desperately does not want to lose this business in which he has invested so much, and which has formed so much of his identity as an adult.

## C.   Body Building, Injuries, Opiate Addiction, and Relationship with Dr. Olivieri

When Anastasis was 16 years old, he began going to the gym and lifting weights. He wanted to get stronger. He also joined the track and field team, and both the soccer and wrestling teams. In particular, the competitive atmosphere created around track and field drove him. He specialized in shotput, and javelin, both Olympic sports, and the stronger he was, the farther he could throw. He also began going to Powerhoue Fitness, a gym in Queens that had a nightclub-like atmosphere. To Anastasios, it was intoxicating, and he was drawn into the "macho" scene there. He trained incessantly with a group of his classmates, always experimenting in trying to get stronger.

In high school, Anastasios refused to take any drugs, or even drink alcohol or smoke marijuana. In college, he loosened his stance on drugs and began experimenting with hormones and anabolic steroids. Part of it related to personal vanity, but he became obsessed with a need to get bigger and stronger. It felt good to him. He played recreational football and soccer, went on white-water rafting excursions, and was always engaged in outdoor activities. He was constantly moving.

10

Even after he opened Nature's Grill, he would reserve 1-2 hours each day to go to the gym. And he was still using hormones.

Anastasios had almost no drug history prior to the age of 30. He was extremely health conscious and was a dedicated athlete and body builder. In 2007, the wear and tear from years of lifting heavy weights began to accumulate and it significantly deteriorated his body - particularly, his back and hip. Anastasios first met Dr. Joseph Olivieri through Nature's Grill. Nature's Grill occasionally catered lunches for his office and, at that time, Anastasios did all the catering deliveries himself. They became friendly. Initially, when Anastasios, began seeking care from Dr. Olivieri, it was for physical therapy, testosterone injections, and because his office performed chiropractic work as well. Anastasios discovered that the doctor prescribed testosterone and other anabolic steroids, such as Nandralone, and began seeking those prescriptions and referring other people to Dr. Olivieri that he would see at the gym.

In 2010, Anastasios was diagnosed with a slipped disc at the L4 & L5 vertebrae, and a herniated disk at C3. He was treating these injuries with chiropractic care, stretching and physical therapy. From 2012-2014, he sustained a hip flexor injury and back spasms. The pain was unbearable, and Dr. Olivieri began prescribing 10mg Percocet. In 2014, Anastasios suffered major thoracic spinal injuries. See, chiropractic records, several MRI's and X-Rays, 2 MRI reports and analysis, and letter from Dr. Vincent Adamo, Attached as Exhibit "B." At this point, his monthly Percocet prescription, which had been gradually increased from 90 to 180 pills, was no longer giving him relief. He was prescribed Oxycodone, which he abused. Each day, after waking up, he would take a pill. He would then continue to consistently take the pills throughout the day. Within a year, his monthly dose increased from 120 to 180 pills a month. Eventually, the daily amount of 30mg Oxycodone pills that Anastasios was taking ballooned to twenty. Because this number of pills was more than he was prescribed, he sought additional pills from other individuals to maintain his habit. He was acquainted through the gym with a small group of weightlifters who were treated by Dr. Olivieri. Anastasios asked them to ask for Oxycodone prescriptions on top of their usual prescriptions and told them that he would purchase the pills from them. Occasionally, he would trade them prescriptions that he had and wasn't using.

At this same time, unbeknownst to Anastasios, Dr. Olivieri was working in conjunction with several "crew chiefs," including Leo Hernandez and Mathew Brady, who would recruit handfuls of individuals to obtain medically unnecessary prescriptions for oxycodone, oxymorphone, morphine

11

sulfate, and amphetamines. These crew chiefs would then purchase the filled prescriptions from the individuals they recruited, and resell them on the streets for a large profit. Hernandez allegedly traveled between the United States and Columbia to facilitate these transactions, while Brady bribed Dr. Olivieri by paying him thousands of dollars in cash in return for issuing prescriptions. Anastasios, on the other hand, paid no such bribes, and did not resell a single pill on the street. Instead, his motivation for requesting others to obtain these medically unnecessary prescriptions was solely to facilitate his out-of-control opiate addiction. He also had no knowledge of the broader scope of Dr. Olivieri's drug conspiracy.

Anastasios's addiction to these opiates stemmed from a desire to numb the pain that he felt as an accumulation of his injuries, which included thoracic spinal injuries, pronation of his left foot, lack of calf muscle development, and continuing hip and back issues. Besides chiropractic treatment, Anastasios sought relief from electric stimulation therapy, inversion tables, shock wave ultrasounds, and physical therapy, all with an aim to help ease the pain. Because his job requires him to constantly be on his feet, his pain was exacerbated, and he believed that the pills he steadfastly consumed, enabled him to get through each day. Despite the massive amount that he was taking, Anastasios would continue to function normally. He never missed work, an event, or an activity in which his children were participating. He knew how to hide all of it. In addition, he still otherwise maintained a healthy lifestyle, or at least he believed that he thought that he was.

In 2018, Dr. Olivieri and Mathew Brady were arrested, and Olivieri's practice was closed. Anastasios found other doctors to prescribe his Oxycodone, but not in the same amount he was getting from Dr. Olivieri. There were times that he bought from people on the street, but his finances prohibited him from buying anywhere close to the amount he had been getting. He slowly started to reduce his daily intake. By the time he was arrested, he was taking approximately 6 pills per day.

On July 30, 2019, Brady was sentenced to 36 months in prison, and he agreed to forfeit $1,000,000. Less than 18 months later, on January 20, 2021, Judge Paul Crotty granted Mr. Brady's request for compassionate release, and re-sentenced him to time-served. On May 28, 2020, Dr. Olivieri was sentenced to 40 months in prison, and he agreed to forfeit $500,000. We believe that Anastasios's conduct pales in comparison to the actions by Olivieri and Brady, which were wide-ranging both in scope and duration, and were motivated almost solely by greed. In contrast to Brady, who was re-selling the substances he received on the street, Anastasios was doing no such

thing, consuming the pills himself, as part of his severe addiction. Most important, he was unaware of Olivieri's scheme with Brady. The sentencing recommendation by the Department of Probation completely fails to make such a distinction or comparison, and does not even acknowledge the existence or outcome of the above two prosecutions, rendering their recommendation to this Court misplaced and incomplete. We respectfully request that the Court not follow it.

**D.      Family and Fatherhood**

In 2010, Anastasios met his wife, Deanna. They met in Mexico while both were on vacation. Deanna is an Armenian refugee. Their cultures are very similar, each with a focus on family and religion as the cornerstones. When they met, Deanna was living in California with her mother and was studying at UCLA to become a dental hygienist. They immediately connected and had trouble staying apart from each other for too long. Anastasios would travel back and forth to see her every few weeks. In 2011, he proposed and, in 2012, they were married. In 2013, they had their first child – Dennis, who is now 8 years old. Anastasios recalls this as possibly the greatest day of his life. In 2015, Deanna gave birth to Emma, who is now 7 years old, and in 2019, she gave birth to Gregory, who is now 3 years old. They bought a home in 2017 on Staten Island and continue to reside there. According to Anastasios, it is much different that living in Brooklyn, and he cherishes the peaceful and serene neighborhood, and their close-knit community. His children love it as well.

Currently, Deanna has gone back to work as a dental hygienist, as the family has desperately needed a second source of income. The silver lining to this has been how it has forced Anastasios to spend less time at work, and more time with his children. Every day, he wakes up at 6:30 to drive the children to school. He then works from 8:00 a.m. - 3:00 p.m. at Nature's Grill, until they are ready to be picked up. His hours from 3-6 is his favorite time of the day, as he spends it with the three of them. When Deanna gets home from work, he goes back to the restaurant from 6-9. Each day, he is the first one at the restaurant and the last one to leave. On top of that, he spends both weekend days at the restaurant. He feels incredible pressure to ensure that the restaurant is a success, and to assist also with raising and providing for Dimitri's two young children. Michael Morgan, a longtime friend, states:

"To his credit, he has been able to continue running the businesses, now without the help of his brother, partner and closest friend, Dimitrios. He is taking care of his nieces, frequently spending time with them and trying his best to give them the life that his brother would have hoped for. Taso would often joke with me saying, "I don't know how you do it with five kids." He recently confided in me, that in his eyes, he now has five kids as well. He views himself ultimately responsible for the upbringing of his nieces. He will be the one to make sure they stay on the right path so that they can have the bright future their late father envisioned for them. He is doing this while trying to spend enough time with his own children and give them the care and attention that they crave and deserve." See, Attached letter from Michael Morgan.



**E.    Arrest, Post-Arrest Conduct, Current Circumstances and Sobriety**

On January 26, 2021, Anastasios was arrested and ultimately released after posting bail. He was devastated by the arrest, and the public nature of it. Articles were written about him, and he was embarrassed by the perception the public had of him, how his reputation would be affected, and how it would affect Nature's Grill. During the pendency of this case, Anastasios has fully complied with all requirements imposed through Pre-Trial Supervision and the Department of Probation.

This whole process has been life-changing for Anastasios. For all of his adult life, he identified himself with his work, and with his reputation and respect of the community, and his peers – which he rightfully earned. His job instilled in him a confidence and sense of pride, and he loved making and delivering food throughout the community. Following his arrest, he initially struggled with feelings of emptiness and loss, as well as an embarrassment for breaking the law, and for the public nature of his arrest and prosecution. Most importantly, he felt terrible for letting down his family, and for knowing that his mistakes could cause harm and hurt to his young children. Anastasios credits his family support in helping him to get through it. In particular, Deanna has been extremely supportive, and their family has grown together emotionally.

Despite the circumstances, Anastasios realized that he must continue to provide for his young family, and he has strived to maintain the normal life that they were used to. Instead of sitting idly, Anastasios continues to work tirelessly.

More importantly, his arrest was also the wake-up call that he needed, and he was determined to remove all opiate use from his life. He did this instantly. In fact, the last pill that he took was the night before he was arrested. He then enrolled in Emoshuns, an outpatient chemical dependency and treatment program. Although the pain that led to his opiate use is still constant, he vowed to quit "cold turkey." Initially, he got sick from withdrawal and was throwing up for weeks and had tremors. He did not let that deter him. Remarkably, he has been successful and has

remained sober. This was confirmed by toxicology results and professional observation throughout the pendency of the 16-week program. Anastasios has also demonstrated an understanding of the seriousness of his actions and demonstrate a commitment to avoid a repeat of his behavior. See, Discharge Letter from Emoshuns/Frank Mannarino, Attached as Exhibit "E."

Despite the constant state of spasms that his back continues to exhibit, Anastasios says mentally he has not felt this good in years. He has absolutely no urge to take another pill. Instead, he takes cold showers, stretches extensively, attends yoga and tai chi classes, and experiments with different forms of herbal remedies. Anastasios is incredibly proud of his accomplishments, and his sobriety that he has achieved during the pendency of this case.

## III.   Sentencing Considerations

We respectfully submit that a number of factors, taken together, justify a significantly reduced sentence from the advisory Guideline range. Those factors include: (1) Anastasios's personal background and current family circumstances; (2) Anastasios's acceptance of responsibility and sincere remorse; and (3) Anastasios's drug history and the role it played in his conduct.

In detailing Anastasios's history, personal and professional life, and the case facts as we understand them, the defense does not intend to minimize the offense. However, we firmly believe that his history of being a hardworking and productive member of the community, as well as a crucial member of his family, further mitigate his actions, which are far less serious than the allegations appear and extremely minor compared to the breadth of the actions taken by others in this conspiracy and by others convicted of narcotics conspiracies. All of this certainly favors a non-custodial sentence and also does not portray the need for any period of incarceration. It must also be highlighted that the Probation Department recognizes that the "case does present the Court with multiple mitigating sentencing factors. (USPO Pre-Sentence Investigation Report, Page 21).

Under the Statutory Provisions, Anastasios is eligible for probation supervision of no less than one year and no greater than five. The Sentencing Guidelines, based on a Total Offense Level of 19 and a Criminal History of I, produce a term of 30 to 37 months incarceration. We respectfully recommend, again unequivocally and in the strongest terms, that the Court sentence Anastasios to probation, for a term and with conditions that satisfy 18 U.S.C. § 3553(a)—a sentence that is "sufficient, but *not greater than necessary*" (emphasis added) to comply with the purposes set forth in 3553(a)(2). Incarceration in this instance exceeds what is necessary to satisfy those sentencing goals.

Regarding the Guidelines, they are a deficient measure of an equitable sentence; advisory only—a point of reference—and just one of several factors the Court must consider. For defendants like Anastasios, they are an especially blunt instrument because the sentencing calculus assigns numeric values to a small range of factors pertaining to some aspects of the offense and criminal history. No value is assigned to the "offense and offender characteristics" that must be reviewed under 3553(a)(1), which heavily favor him.

A review of the factors that the Court must consider under § 3553(a), as described below, supports this view. The defense urges the Court to consider the following:

<u>Nature and circumstances of the offense</u>

Defendants with no criminal history commonly assert that an offense is uncharacteristic, driven by events and circumstances. The claim is often accurate. Good people sometimes do bad things. While this does apply to Anastasios in reductive terms, we believe that the particulars again distinguish Anastasios from others convicted of narcotics conspiracies. Anastasios's actions were far less nefarious and wide-ranging than the charge suggests and his role and actions, while regrettable, were monumentally less than those convicted of similar crimes and others involved in this conspiracy. To be clear, the breadth of Anastasios's narcotics related activity was almost exclusively limited to referring patients to a doctor to obtain prescriptions for opiates, so that they could in turn sell them back to him for his own personal use. He did not, like others convicted in this scheme, purchase the drugs so that he could resell them. He was not motivated by greed and he made no money off of his conduct. His actions were not part of any overarching desire to deal narcotics, but were a byproduct of his own addiction to painkillers. Most importantly, the person who committed this crime is all but a distant memory. Now sober, and with three children and a wife, Anastasios continues to pursue nothing but productive employment through his business and how to be a better father. Any drug use or illegal activity is completely remote, and was terminated years ago on his own volition.

Anastasios's misconduct is inconsistent with his lifetime of positive contributions to his family, business, and community. Although Anastasios pled guilty to participation in a conspiracy to distribute oxycodone, his actions were far less nefarious and wide-ranging than the charge suggests. Specifically, (1) his role in the conspiracy was monumentally less than that of his co-defendants; (2) he did not refer patients so that he could purchase drugs to resell; (3) his reliance on prescription pain medication fueled his actions, and; (4) there are mitigating factors, particularly his crucial role as a father and business owner who employs dozens of people.

Regarding the broader context for the offense, Anastasios Verteouris was, at the time, a 40-year-old, restaurant owner and father of three. He is someone who came from very humble beginnings, and who has lived an incredibly rich and diverse life, full of a variety of pursuits, including starting, growing, and operating a successful health food restaurant in a city where the majority of new restaurants fail within the first year. He was formerly as dedicated to his health and body building as he was to his restaurant, and that dedication to building strength had the opposite

effect - it caused lasting and painful injuries. Anastasios then muted the pain with opiate use. His opiate use spiraled out of control and led him to find ways to increase his monthly habit. Although he did purchase narcotics from individuals who obtained medically unnecessary prescriptions, he did not purchase the drugs to resell or to make a profit, but he only obtained the pills to use for his pain and addiction. He was certainly not a drug dealer. In addition, any activity in this regard was terminated years ago.

Importantly, Anastasios has never previously been accused of criminality. He has never been arrested. He is a tireless worker and advocate for his health food restaurant and his employees. Anastasios is an impressive and unique individual who is adored by his daughter and two sons. Certainly, he acted improperly and should be held accountable; however, a punishment that includes incarceration is unnecessary and will be incredibly harmful to his family, especially after considering the above-cited factors which clearly distinguish this defendant and this offense from others seemingly of their kind and favor leniency.

He was simply a man who foolishly and without much thought got involved with a doctor who was able to prescribe him opiates for his pain. Importantly, this doctor was not recruited, but was someone whom Anastasios initially met through seeking legitimate treatment. Subsequently, the pain medicine that Dr. Olivieri prescribed *him* was medically necessary. Unfortunately, like many others, as his body became reliant on the opiates that he was prescribed, more and more was needed to maintain the desired effect. When that amount became more than Dr. Olivieri could prescribe, Anastasios began buying opiates off of other patients of Dr. Olivieri. While it is true that Anastasios did occasionally refer friends to Dr. Olivier for this purpose, it was infrequent. Of all the individuals who reportedly referred people to Dr. Olivieri, Anasatsios sent the "fewest." See, Interview of Shakuntula Mahadeo, USAO_124238). Anastasios believes that the number of individuals he referred for this purpose to be less than 5. To be sure, in interviews of Shakuntula Mahadeo, a receptionist for Dr. Olivier, Ms. Mahadeo stated that she was only aware of three (3) patients referred by Anastasios.

In contrast, the scheme undertaken by Dr. Olivieri and others, such as Mathew Brady, was designed to generate huge sums of money. In particular, during the time period spanning 2013-2018, Dr. Olivieri was one of the top 15 prescribers of opioids in the State of New York. Working in conjunction with individuals like Brady, Dr. Olivieri was paid bribes of thousands of dollars per patient, ultimately depositing at least $1,000,000.00 in his bank accounts over the course of the scheme. Brady, who was one of Dr. Olivieri's "crew chiefs," was reportedly responsible for recruiting co-workers to send to Dr. Olivieri, who would sell Brady the prescribed pills for him to sell at much higher prices on the illegal market for a substantial profit. See, S2 18 Cr. 316, Gov't Sentencing Memorandum, ECF # 102. Dr. Olivieri would also prescribe unnecessary steroids in exchange for cash, directly from patients, and was observed on recorded video prescribing illegitimate prescriptions to an undercover officer posing as a patient. Brady, who was designated as a manager of the scheme, engaged in this conspiracy to make money, and recruited others whose motivation was the same. See, S2 18 Cr. 316, Gov't Sentencing Memorandum, ECF #89. However, while Anastasios's conduct was certainly improper, and he took advantage of the opportunity that presented itself, he cannot and should not be held responsible for the breadth of the conspiracy undertaken by Dr. Olivieri and Brady.

While we acknowledge that Anastasios was involved, we submit it was a tangential involvement, and unrelated to the overarching scheme. Even the Government's evidence reveals that Anastasios's last time engaging in such conduct was in 2018. Indeed, the Government is only holding him accountable for 2% of the entire weight of the conspiracy. While not insignificant, Anastasios's participation in this case can only be characterized as minor compared to the breadth of the actions of other members of the conspiracy. While Anastasios pled guilty to conspiring to distribute oxycodone, many of his co-defendants were involved in the buying and selling of much larger quantity of narcotics, over a much longer period of time, and, importantly, Anastasios's association with this activity stemmed solely from his own substance abuse issues, and legitimate medical issues that formed the basis of his relationship with Dr. Olivieri. Certainly, Anastasios acted improperly and should be held accountable; however, he should not be held accountable for conduct that is not attributable to him. He has not denied participating in this scheme or committing the actions to which he admitted in his guilty plea. The above-cited factors clearly distinguish this defendant and this offense from others and favor leniency.

History and Characteristics of the Defendant

It is not difficult to assess the true character of an individual. It is established through evidence of hard work, family history, present family circumstances, charitable activities, community relations, and history of good or bad deeds. There is no question that Anastasios is someone, who up until this arrest, had led a life as a loving father, extremely hard worker, restaurant owner, and entrepreneur. His misconduct is inconsistent with the person he has been for the past 44 years. He has proven his value to a society of people who, despite this serious misconduct, admire and support him. (See, Letters in Support of Anastasios Verteouris, Attached as Exhibit "F"). As someone without a college diploma, he learned a business that he was passionate about and became successful running his own business, based solely on how hard he was willing to work, the integrity of his word, and the strength of his personality. Although recently his business has slowed and he has amassed an incredible amount of debt, he continues to garner respect in the community and has a wide array of loyal customers who love his restaurant and his food. He works tirelessly to keep his business afloat. Through all of it, he has remained, above all else, a dedicated family man, and a crucial influence and guiding force in his children's lives, where he is heavily involved in every aspect of their lives. Outside of his serious lapse in judgment in connection with this case, one cannot assert with any credibility that Anastasios has lived a remotely delinquent or criminal lifestyle. He is the head of his household, a relentless worker, and a respected member of society. He is well respected and loved by the countless members of his extended family and relied upon by his children, who desperately need him in their lives. According to Emmanuel Kosmas, Anatasios's younger brother:

> "[Anastasios] is the oldest of my five siblings. He has always been the leader of a large pack growing up in a Greek household. He has, and continues to be, the one to show us what drive, commitment, hard work, and passion looks like. Taso has always put his family first, through all we've gone through either together or individually, especially through times of emotional hardships."

The defense strongly urges the Court to consider this history, for which the Guidelines entirely fail to account, which should matter profoundly when determining one's punishment. While

Anastasios's offense was wrongful and merits punishment, we firmly believe that it is a truly isolated event and not representative of his true character. Surely, his minimal involvement in this offense is not so serious that it outweighs his previous 44 years of good conduct, the two unblemished years after his arrest, and the potential to live an extremely productive life.

Rev. Fr. Gerasmos Makris, of the Holy Cross Greek Orthodox Church, states:

> "Mr. Anastasios is a good-natured man, humble, reverent and respectful. He is a hard worker and responsible at work. He is always willing to help when there is need. For over 3 years he generously and repeatedly donated food supplies for my parish's Feeding the Homeless Program and takes great pleasure in doing this."

He was and is a fundamentally decent person and an asset to his community. Certainly, he acted improperly and should be held accountable; however, he is someone who deserves leniency under the law and not a sentence of incarceration. Deanna Verteouris, Anastasios's wife, may have described Anastasios best when she states:

> "In the 12 years since I met him, he has made me a better version of myself. He is my everything! I didn't know what I wanted from life, I had no life plan or long term goals, but he made me realize that I can do and have done more than I ever imagined I was capable of. He lives for his family and is so involved in every aspect of our lives. He is the most hardworking, compassionate, selfless and kind individual I have ever met. From before the children wake up in the morning until late at night after they have gone to bed, he doesn't stop. Even after they are asleep, he is still doing necessary tasks in order to have them ready for the next day."

Elias Karalekas, who has known Anastasios for over 10 years, states:

> "As a son Taso has been the rock for his mother. Without Taso his mom Effie would have caved in from his Brother Dimitri's death. Taso stepped up and has supported her and his brother's kids. Taso put a monster burden on his shoulders that very few people could embrace. Taso is the glue that has kept the family from breaking apart. Taso has stepped into the role as father for his brother Dmitri's kids. As a brother Taso has been there for all his siblings. Taso has never let any of them down and has kept them all on a straight path in life to succeed in their endeavors by either letting them work at his store or him supporting the choice that they make in life. In closing please be lenient to Taso he is a good human being who makes a positive difference in the people around him."

Anastasios is a dedicated family man and a relentless worker, and someone who we believe deserves leniency. He has three young children that rely on him tremendously, as he works days, nights and weekends so that he can provide for them. When he is not at work, he is with his family, who adore him. Considering the circumstances of this case, his previous substance abuse and efforts to sustain sobriety, and the one and a half years of good behavior that he has exhibited following his arrest, we urge Your Honor to impose a non-incarceratory sentence.

Collateral Consequences and Non-Judicial Punishment:

The non-judicial punishments that have already accrued to Anastasios are substantial. First, with a felony conviction, he cannot perform many civic duties. More importantly, as a result of his arrest, because of his restaurant's position in the community, there was a substantial amount of press detailing his arrest and conduct. The embarrassment and stress that this caused Anastasios and his family, particularly in the wake of his brother's death, was unbearable. It remains to be seen what effect the conviction will have on the future of Nature's Grill and the damage to his reputation has been a source of nearly constant anxiety. While his family has been extremely supportive, he is particularly concerned that his children will eventually read about it on the internet, or that the parents of his children's friends or his future employers or colleagues will view him as a criminal, especially because the press surrounding his arrest depicted him as a drug dealer.

Anastasios is devastated for his own personal losses, but is more concerned about the future and his ability to support his family, and he is terrified of being forced to be separated from them for any period of time. We submit that Anastasios' family circumstances warrant consideration for leniency at sentencing. The multitude of letters of support submitted to the Court in this case make it crystal clear that Anastasios' immediate and extended family – including the many friends, co-workers, and neighbors in his community who also consider Anastasios a part of their extended family – both support him and rely on him to an exceptional degree. A sentence involving imprisonment would deprive many individuals the benefit of Anastasios' kindness, compassion, and devotion to helping others, as well as his ability to continue to run his restaurant which employs many others. It would also place his wife and children in an untenable and incredibly burdensome financial position. As such, we submit that this factor strongly weighs in favor of leniency.

The consequences that any defendant's conduct has upon his family are present in nearly every case and, of course, the blame for the damage inflicted lies principally with Anastasios because he created this situation. However, the potential wreckage that could result from incarceration will be especially difficult for his family, and in our opinion, unnecessary, to the extent that it would demand sending a father of a young family to prison.

Anastasios Verterouris's Criminal History

In detailing Anastasios's background and present circumstances, we intend not to diminish the charged offense, but to provide explanatory context and a broad picture of his life. Regarding criminal history, Anastasios has no previous convictions, including no history of juvenile delinquency or violent behavior, let alone criminal conduct. Instead, he has been a respected and dedicated restauranter and employer. In short, Anastasios has led a quite exceptional life, in which he worked tremendously hard in growing his business, feeding, and helping the community, all the while supporting himself and his three children. Anastasios' 44 years of hard work and blemish free conduct, portray a life that is totally at odds with the conduct that led to the charges underlying this unfortunate case, which should matter profoundly when determining his punishment.

<u>The Sentencing Guidelines Enhancements Disproportionately Punish Anastasios</u>

        The Guidelines range inherently skews in favor of greater punishment and is therefore a poor benchmark from which to gauge the suitability of a given sentence. In this case, the Guidelines range is inflated due to the estimated weight of the drugs, and has seemingly led to an exceedingly harsh and arbitrary potential punishment. Despite no evidence that Anastasios gained any significant financial benefit, or that he even dealt the controlled substances, drug guidelines in this case have been extraordinarily inflated. Individuals charged with conspiracy to distribute face similar guidelines whether they are an addict or a dealer, which are often disproportionate to the individual's actual involvement. Further, the stipulated Guideline range for imprisonment is 30-37 months, although the parties have agreed that either party may seek a sentence outside of the Stipulated Guideline Range, is overly punitive and would punish Anastasios excessively. This is illustrated by the fact that Brady, whose conduct was incredibly more aggravating that Anastasios's, served only 18 months in prison. Furthermore, the head of the conspiracy, who was solely responsible for circulating and pumping dangerous drugs into the community, and who made over $1,000,000, only received a sentence of 40 months. The defense urges the Court to focus on the defendant's personal intent and motivation to engage in this conduct and to show leniency to Anastasios.

        The Guidelines, which are not mandatory, have been criticized by the defense bar and many prominent judges, as leading to seemingly arbitrary and irrational punishments for certain drug offenses. Among the several factors assigned points in the offense-level computation applicable to this matter, only one, for acceptance of responsibility, allows a possible deduction. Because it relies on a decidedly narrow and punitive calculus, and excludes § 3553(a) factors that the Court must now consider - defendant's history, condition and character; circumstances underlying offense conduct; collateral consequences of a given sentence - even the minimums are inflated. Were it possible to incorporate these meaningful qualitative elements into such a rigid algebraic scheme, thus bringing it in line with current law, we believe that Anastasios would handily qualify for a much lesser sentence. Given that the Guidelines are now merely advisory, such a sentence appropriately reflects the sentencing factors under § 3553(a). The defense requests that the Court take this into consideration when determining an appropriate sentence.

**(a)(2) Per § 3553(a)(2),** factors to be considered in imposing a sentence:

        Subsection (a)(2) dictates that the Court contemplate the following purposes of sentencing: (a) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In short: retribution, deterrence, incapacitation, and rehabilitation. Neither of these purposes require the need to incarcerate the father of 3 young children who sought unnecessary prescriptions from others so that he could feed his own destructive dependency.

**(a)(3)   The kinds of sentences available:**

        The parties have agreed that the total Guidelines offense level in this case is 19, which is considered Zone B by the U.S. Probation Office.

The Guidelines range inherently skews in favor of greater punishment and is therefore a poor benchmark from which to gauge the suitability of a given sentence. The maximum term of imprisonment is 20 years. The bottom-end of the Guidelines range from 30 to 37 months incarceration and allows for a probationary sentence. Anastasios is eligible for probation under the Advisory Guidelines Provisions, in both instances, a term of between one and five years Among the several factors assigned points in the offense-level computation, only one, for acceptance of responsibility, allows a possible deduction. Because it relies on a decidedly narrow and punitive calculus, and excludes § 3553(a) factors that the Court must now consider—defendant's history, condition and character; circumstances underlying offense conduct; collateral consequences of a given sentence—even the minimums are inflated. Were it possible to incorporate these meaningful qualitative elements into such a rigid algebraic scheme, thus bringing it in line with current law, we believe that Anastasios would handily qualify for supervision alone.

Given that the Guidelines are now merely advisory, such a sentence appropriately reflects the sentencing factors under § 3553(a). This recommendation reflects the nature of Anastasios's involvement and the person that he is.

**(a)(4)** The kinds of sentence and the sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines and (B) violations of probation or supervision:

**Regarding (A), see (a)(3).**

**Regarding (B),** it does not apply to this case. Anastasios has fully complied with Pretrial Services for the fifteen months following his arrest.

**(a)(5)** Any pertinent policy statement issued by the Sentencing Commission
There is no such statement in this case.

**(a)(6)** The need to avoid unwarranted sentence disparities among similar defendants, who have been convicted of similar conduct

**See (a)(3),** which addresses the suitability of a non-custodial sentence. Because supervision without any form of detention is a short remove from the Guidelines minimum, and within the statutory range, any disparity between our proposed sentence and those given to seemingly similar defendants would be negligible.

**(a)(7)  The need to provide restitution to victims**
The defense urges the Court to impose a non-incarceratory sentence with any conditions that the Court deems appropriate.

## IV.   Recommendation

In detailing Anastasios' history, personal and professional life, and the case facts as we understand them, the defense does not intend to minimize the offense. However, we firmly believe

that his history of being a productive member of the community, as well as a crucial member of his family, further mitigate his actions, which are far less serious than the allegations appear. Based on the above, the defense respectfully recommends that, in the interest of justice, the Court impose a non-incarceratory sentence, with any conditions that the Court deems appropriate. Such a sentence is wholly consistent with the case facts and Anastasios's history, and ultimately, will best serve the community.

Thank you for your time and consideration in this matter.

Respectfully submitted,

Arthur L. Aidala
Aidala, Bertuna & Kamins, P.C.
Attorneys for Anastasios Verteouris

ALA:dg

24